[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 313 
This is a companion case to Deep v. State, 414 So.2d 141
(Ala.Cr.App. 1982), cert. denied. Following Deep's conviction for theft, the defendant in this cause was indicted for the theft of the same property, a Morgan portable building, in violation of Alabama Code 1975, Section 13A-8-3. Sentence was three years' imprisonment. Seven issues are raised on appeal.
 I
The theft of the building occurred while the defendant was the Director of Disaster Housing in Mobile following Hurricane Frederic. William Foster was the Mobile Home Chief of the Disaster Housing Office from September 14, 1979, until April 30, 1980. During this time he kept a personal diary relating to the operations of the Disaster Housing Office. The defendant contends that the failure of the trial judge to order the production of the entire diary constitutes reversible error.
Four days before trial, the defendant formalized his request for production of the diary by causing Foster to be served with a subpoena duces tecum as authorized by Alabama Code 1975, Section 12-21-2.
After a jury had been empaneled but before any witness had taken the stand, a hearing was conducted to determine whether *Page 314 
Foster would be required to produce the diary for inspection by the defense. Although Foster testified as a State's witness at the trial of Toofie Deep, defense counsel stated that he did not know the contents of the diary, but that its production was essential to impeach the anticipated testimony Foster would give as a State witness. The following colloquy is revealing:
 "THE COURT: What, specifically, are you looking for in it, Mr. Byrne (defense counsel)? Can you tell the court that?
 "MR. BYRNE: Your Honor, I don't have any idea. All I know is that the State of Alabama has taken a document that is not their work product and they are jumping up and down to prevent it from being brought to light in any fashion. And we submit, and based upon . . . I don't know what is in it."
* * * * * *
 "MR. BYRNE: Well, we know through the testimony of that witness that there were conversations on January the 4th, on January the 7th, and at the Deep trial he testifies to who was there. I want to know if there is a notation in there that on that day, January 4, the day prior or the day this building was moved, whether my client was there or not. I want to know if he was present on January the 7th, and I don't want to take the D.A.'s stipulations."
Later in the proceedings the following exchange occurred:
 "THE COURT: Do you want January the 4th and 7th, and March the 4th; or all from September the 12th to April the 30th?
 "MR. BYRNE: What I would like, Your Honor, particularly, is at least an in camera review and statement on the part of the court as a result of the in camera review that nothing appears relevant to this proceeding from the beginning of it until April 30th. And, in addition, we would like the entries which deal particularly with January the 4th, January the 7th and March the 4th, plus or minus four days."
* * * * * *
 ". . . But we say we are absolutely entitled to January the 4th and January the 7th. And we really, basically, submit that under the due process clause, we are entitled from September the 13th until April the 30th."
The District Attorney moved to quash the subpoena duces tecum that had been served on Foster alleging that the defense was attempting to conduct a "fishing expedition". Also, the District Attorney vigorously contended that Foster's diary, which was in the District Attorney's possession at the time of the hearing, was protected from disclosure by the Grand Jury Secrecy Act (Alabama Code 1975, Section 12-16-214 et seq.). The District Attorney argued that, if the contents of the diary were divulged, further investigation into the alleged irregularities in the operation of the Department of Civil Defense and in the Disaster Housing Office would be "severely hampered".
At the hearing, Foster testified that he had made the diary at the suggestion of his personal friend, then State Senator Bishop Barron[1], to "protect" himself. The diary was not made for the purpose of prosecuting anyone. It consisted of Foster's handwritten personal observations and copies of various documents and records which came through the Disaster Housing Office.
Foster gave the diary to Senator Barron for safekeeping during the first week in May, 1980. Foster gave the Senator "full authorization" to use the diary as he saw fit: "I authorized him to do what . . . would be the right thing to do as far as the law is concerned, because he knows more about it than I do." Although Senator Barron was a practicing attorney, he was acting only as Foster's friend and there was no attorney-client relationship.
Foster was served with a Grand Jury subpoena on the 1st of June, 1980. In response *Page 315 
to that subpoena, he delivered his diary to the District Attorney of Montgomery County. Foster testified that, since that time, the diary has never been in his possession. The defendant's subpoena duces tecum was served on March 13, 1981.
When Foster testified before the Grand Jury in June of 1980, he did not use his diary. However, the diary was used by an Assistant District Attorney in questioning Foster.
The day following this hearing the defendant's trial began and the trial judge entered an order[2] requiring the District Attorney to make available to the defendant the entries in the diary for January 5th and 6th and March 4, 1980. The trial judge stated in its order that he had read the diary in its entirety and was not persuaded that the entire diary should be made available to the defendant. The judge found that the defendant's name was not mentioned in the diary entries for January 4th and 7th or March 4, 1980.
In our opinion, the trial court's order denying the defendant's request for production of the complete diary was proper and within his discretion. The order of the trial judge is self-explanatory and does not require further justification. However, the following comments are warranted by the facts of this case.
Although the defendant and the State on this appeal have spent considerable time debating whether or not the subpoena duces tecum served on Foster should have been enforced or quashed, we do not believe that a discussion of this issue is necessary for the resolution of the question now presented.
Initially, it must be noted that, when the subpoena was served on Foster, he did not have possession of the diary. The factual issue of whether or not Foster could have obtained possession of the diary from the District Attorney or whether he had relinquished all ownership and control over the document has never been presented.
It is apparent from the March 16th hearing that, when it was learned that Foster did not have possession of the diary and that the diary was actually in the possession of the District Attorney, the defendant focused his attention on having the State produce the diary, not Foster. Argument concerning Foster's compliance with the subpoena duces tecum to produce the diary was, for all intents and purposes, abandoned. Indeed, the trial judge's order requiring partial production was directed to the District Attorney, not Foster. Thus, whether or not there was technical compliance with Alabama Code 1975, Section 12-21-2 in seeking the enforcement of the subpoena duces tecum would resolve nothing.[3]
The real question is not whether Foster should have been required to produce the entire diary before he testified at trial, but whether the State, who had the diary, should have. *Page 316 
The Supreme Court of this state, in the recently decided caseEx parte Pate, 415 So.2d 1140 (Ala. 1981), reviewed the question "whether or when the defendant in a criminal case is entitled to inspection of a statement of a prosecution witness for the purpose of cross examination or impeaching the witness." This case confirmed the "general rule that an accused is not entitled to discover statements of government witnesses before trial." Thigpen v. State, 355 So.2d 392 (Ala.Cr.App.), affirmed, 355 So.2d 400 (Ala. 1977); Beard v. State,337 So.2d 1372 (Ala.Cr.App. 1976). The Court specifically noted that "(t)he rule of discovery is different where a prosecution witness has testified on direct examination in the trial of the case from the instance where the statement is sought before the witness testifies."
Time and time again the courts of this state have held that an accused is not entitled to the inspection or discovery of evidence in the possession of the prosecution to conduct a mere fishing expedition in preparation of his defense. Smith v.State, 282 Ala. 268, 210 So.2d 826 (1968); Sanders v. State,278 Ala. 453, 179 So.2d 35 (1965); Cooks v. State, 50 Ala. App. 49, 276 So.2d 634, cert. denied, 290 Ala. 363, 276 So.2d 640
(1973). This principle comports with the general proposition that a defendant is not, as a matter of right, entitled to inspection or disclosure of evidence in the possession of the prosecution prior to trial. Bellew v. State, 238 Miss. 734,106 So.2d 146 (1958), cert. denied, 360 U.S. 473, 79 S.Ct. 1430,3 L.Ed.2d 1531 (1959). Also see Annot., Discovery-Prosecution'sEvidence, 7 A.L.R.2d 8, 22 (1966); C. Gamble, McElroy's AlabamaEvidence, Section 290.05 (3rd ed. 1977).
We hold, as did the trial judge, that when a defendant's avowed purpose for inspecting a statement or document prepared by a potential prosecution witness is to cross examine or impeach that witness's testimony should he actually testify, then any such request for production prior to trial is premature. Pate, supra; Millican v. State, 423 So.2d 268
(Ala.Cr.App. 1982).
Furthermore, the defendant received all the specific
information he requested. The defendant specifically wanted to know whether Foster's diary contained a notation that he was present during conversations concerning the Morgan portable building on January 4th and 7th and March 4th of 1980. He further requested that the trial court conduct an in camera
review of the entire diary for relevancy to the instant proceeding. Out of an abundance of caution and because the defendant had alluded to Brady v. Maryland, 373 U.S. 83,83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in his argument for the pretrial production of the diary, the trial judge complied with each specific request.
The trial court, mindful of Brady, read the entire diary incamera and was not persuaded of its relevancy to the defendant's case. Relying on Monroe v. Blackburn, 607 F.2d 148
(5th Cir. 1979), the trial court determined that the defendant's request had been "sufficiently particularized" to order the production of the diary entries for January 5th and 6th and March 4, 1980. The trial court informed the defendant that his name had not been mentioned in Foster's diary on January 4th and 7th or March 4, 1980.
Even had the defendant premised his argument for the diary totally on Brady and not on some possible need he might have to cross examine and impeach an anticipated prosecution witness, he would have fallen short. It is clear that in order to establish a Brady violation the defendant must prove three things:
 "(1) The prosecution's suppression of evidence; (2) The favorable character of the suppressed evidence for the defense; (3) The materiality of the suppressed evidence."
Monroe, 607 F.2d, at 150.
The defendant here satisfied neither of the last two parts of the test.
Finally, it should be pointed out that Foster was later called as a State witness during the defendant's trial. During direct examination the State questioned him in some detail concerning the conversations he *Page 317 
had had with Toofie Deep on January 4th and 7th, 1980, about moving the portable building from Mobile to Deep's backyard in Montgomery. There is no indication in the record that Foster "refreshed his recollection" or referred to the diary in any way in answering the State's questions.
On cross examination, defense counsel ascertained that the defendant was not present with Foster and Deep at either the January 4th or 7th conversation. The defendant made no further request for any part of Foster's diary for impeachment or any other purpose. From the record it does not appear that defense counsel used those portions of the diary it did have to cross examine the witness.
Other facets of this issue, not answered in this opinion, have been adequately treated and determined by the trial judge in his order on the motion to produce, which has been made a part of this opinion. We find no error in the action of the trial judge in refusing to order production of the entire diary.
 II
Toofie Deep was the Deputy Director of the Disaster Housing Office. He had been hired by the defendant. At Deep's trial, which was had before the defendant had been indicted, the defendant gave testimony incriminating himself in a conspiracy with Deep to "transport" the portable building to Deep's backyard in Montgomery and also having submitted false vouchers pertaining to the building.
On January 23 and March 13, 1981, the defendant filed pretrial motions to suppress the testimony he had given in the Deep trial and to keep it from being introduced into evidence at his trial. His central contention was, and is, that to introduce his prior testimony would violate his Fifth Amendment right against self-incrimination.
Two pretrial hearings were conducted to consider the defendant's motions to suppress his prior testimony. The first was held on February 18, 1981. At that hearing the following information came to light concerning the defendant's prior testimony:
 (1) The defendant was represented by retained counsel at the time he testified in the Deep trial. This same counsel represented the defendant at his trial and on this appeal. The trial judge recognized that "Mr. Byrne is one of the most able criminal attorneys in this part of the state."
 (2) Defendant's counsel was advised two weeks before Deep's trial that Deep's defense counsel wished to call the defendant as a defense witness.
 (3) Prior to the defendant taking the witness stand in the Deep trial, his defense counsel advised him of his right not to incriminate himself and that he could put himself in jeopardy by taking the witness stand. Defendant's counsel further advised the defendant that if he were asked any questions which he had any doubt about to ask the trial court for a recess so that he (defense counsel) could talk to him.
 (4) Defendant's counsel was present in the courtroom during the defendant's testimony.
 (5) Defendant's counsel advised Deep's defense counsel "exparte lawyer to lawyer" to "claim" the defendant's Fifth Amendment rights "in his behalf" should it become "necessary" during Deep's trial.
 (6) The District Attorney had made it clear to the defendant's counsel in the Deep trial that the defendant did not have to take the stand, that he could take the Fifth Amendment, but if he took the witness stand that he would be subjected to a vigorous cross examination.
On March 16, 1981, the second pretrial hearing to consider the defendant's motions to suppress his testimony at the Deep trial was conducted. There, the trial court determined, after hearing testimony and argument, that the defendant's prior testimony would be admissible if certain extraneous matters were deleted from the Deep transcript.
It is conceded by the defendant on appeal that the trial court in the Deep trial could *Page 318 
not have possibly known beforehand what his testimony would be when he was called as a defense witness. However, it is claimed that because the trial court in the Deep trial did not advise the defendant of his Fifth Amendment right not to incriminate himself it was reversible error for the State to introduce his prior testimony in this case. We disagree.
At Deep's trial, the defendant was called as a defense witness. He was not subpoenaed by the State. The privilege against self-incrimination is against being compelled to be a witness or give evidence against one's self. Hubbard v. State,283 Ala. 183, 215 So.2d 261 (1968); Alabama Constitution of 1901, Section 6.
 "It is designed to prevent the use of legal process to force from the lips of the accused individual the evidence necessary to convict him or to force him to produce and authenticate any personal documents or effects that might incriminate him . . . The prosecutors are forced to search for independent evidence instead of relying upon proof extracted from individuals by force of law . . . It protects the individual from any disclosure, in the form of oral testimony, documents or chattels, sought by legal process against him as a witness." United States v. White, 322 U.S. 694, 698-99, 64 S.Ct. 1248, 1251, 88 L.Ed.2d 1542. (emphasis added)
At the hearing on the Motion to Suppress the defendant's testimony in the Deep trial, defense counsel stated that after he had been advised that Deep's defense counsel wanted to call the defendant as a witness he discussed the matter with the defendant.
 "I talked to my client about it. Advised him that if he said anything, it could be used against him. I did not give him a technical Miranda warning, but I did tell him . . . I said, if you are asked any question which you have a doubt about, ask the Court for a recess. I'm going to be behind the bar, and not going to be in a position that I can get to you easily. And that is what I instructed him the morning before he went on, say, like at one o'clock in the afternoon."
* * * * * *
 "I didn't classify it as the Fifth Amendment I told him that if he testified and incriminated himself, he would put himself in jeopardy."
* * * * * *
 "Because what I told him was that if it incriminated him, don't say anything. Don't go there.
 "THE COURT: Okay, at least we have a situation where we know you told him that if he thought he was going to say something that was going to incriminate him, then he knew he shouldn't answer it. Can I characterize it this way?
 "MR. BYRNE: Yes, sir. In fact, what I told him was that if you've got a doubt, ask the Judge for a recess so that I can get to you."
In testifying at Deep's trial, the defendant never requested a recess so that he could consult with counsel.
The defendant's counsel advised Deep's defense attorney to claim the Fifth Amendment privilege for the defendant if it became necessary: "I did use the words Fifth Amendment with him; and then I want you to claim it in his behalf. Now, that was exparte lawyer to lawyer. Killough was not part and parcel of that conversation that I had."
The District Attorney advised defense counsel that the defendant was a co-conspirator and would be cross examined if he testified as a defense witness.
 "Prior to Mr. Killough ever going on the stand, Mr. Byrne appeared in Chambers with the Court and actively sought the limitation of cross examination of Mr. Killough."
* * * * * *
 "And the statement was made by the State Prosecutor that he does not have to take the stand; he can take the Fifth Amendment. But if you tender that witness, *Page 319 
he is subject to cross examination, and we intend to cross examine him."
* * * * * *
 "When Mr. Byrne came in to stop us in our cross examination, I advised him . . . to the effect that, you don't have to tender him as a witness. He is a co-conspirator and he is going to be cross examined, and he can take the Fifth Amendment."
The significance of the fact that defense counsel attempted to limit the State in its cross examination of the defendant was stated by the District Attorney: "The fact that the witness himself sought to limit cross examination, was told that he was a co-conspirator, that he didn't have to testify, that he could take the Fifth Amendment, and raised the very issue of his own conspiracy is certainly voluntariness in its purest form."
Inculpatory statements voluntarily made by a defendant are admissible against him even if made by the accused when testifying at the trial of another person before being charged with a crime. Monroe v. State, 23 Ala. App. 441, 126 So. 614
(1930). It is proper for the whole of such testimony to be placed in evidence. Green v. State, 24 Ala. App. 235,133 So. 739 (1931). See also Odiorne v. State, 249 Ala. 375,31 So.2d 132 (1947); Wilson v. State, 110 Ala. 1, 20 So. 415 (1895);Edwards v. State, 34 Ala. App. 373, 40 So.2d 103 (1949); Coplonv. State, 15 Ala. App. 331, 73 So. 225, cert. denied, 199 Ala. 698,74 So. 1005 (1916). These cases are in accord with the general rule:
 "A confession consisting of a statement under oath, made by accused when he testified, before he was charged with the crime, at the preliminary examination or trial of another person, is admissible against him, except in some jurisdictions. He has the right, however, to remain silent on the ground that his answer might tend to incriminate him; and if he is compelled to answer after thus objecting, the answer elicited, having been obtained by compulsion, is not competent as a confession. Furthermore, even though the confessor did not claim his privilege against self-incrimination, if the circumstances are such that in testifying the confessor did not intend to waive his constitutional rights, and was not fully aware of consequences of the confession, it may not be admissible in a subsequent trial of the confessor." 23 C.J.S. Criminal Law, Section 830 (1961).
Cited with approval in Monroe, 23 Ala. App. at 442, 126 So. 614.
"In the absence of compulsion, a witness may volunteer incriminating testimony, if that is his choice." United StatesPlesons, 560 F.2d 890, 894 (8th Cir. 1977).
 "(I)t is also axiomatic that the (Fifth) Amendment does not automatically preclude self-incrimination, whether spontaneous or in response to questions put by government officials. `It does not preclude a witness from testifying voluntarily in matters which may incriminate him,' United States v. Monia, 317 U.S. 424, 427 [63 S.Ct. 409, 410, 87 L.Ed. 376] (1943), for `those competent and freewilled to do so may give evidence against the whole world, themselves included.' United States v. Kimball, 117 F. 156, 163 (CCSDNY 1902); accord, Miranda, supra, [384 U.S. 436] at 478 [86 S.Ct. 1602 at 1629, 16 L.Ed.2d 694]; Michigan v. Tucker, 417 U.S. 433 [94 S.Ct. 2357, 41 L.Ed.2d 182] (1974); Hoffa v. United States, 385 U.S. 293 [87 S.Ct. 408, 17 L.Ed.2d 374] (1966). Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable. In addition to guaranteeing the right to remain silent unless immunity is granted, the Fifth Amendment proscribes only self-incrimination obtained by a `genuine compulsion of testimony.' Michigan v. Tucker, supra, [417 U.S.] at 440 [94 S.Ct. at 2362]. Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions. Accordingly, unless the record reveals some compulsion, respondent's incriminating testimony cannot conflict with any constitutional guarantees of the privilege. *Page 320 
 "The Constitution does not prohibit every element which influences a criminal suspect to make incriminating admissions. Of course, for many witnesses the grand jury room engenders an atmosphere conducive to truth-telling, for it is likely that upon being brought before such a body of neighbors and fellow citizens, and having been placed under a solemn oath to tell the truth, many witnesses will feel obliged to do just that. But it does not offend the guarantees of the Fifth Amendment if in that setting a witness is more likely to tell the truth than in less solemn surroundings. The constitutional guarantee is only that the witness be not compelled to give self-incriminating testimony. The test is whether, considering the totality of the circumstances, the free will of the witness was overborne."
 United States v. Washington, 431 U.S. 181, 186-88, 97 S.Ct. 1814 [1818-19], 52 L.Ed.2d 238 (1977). (Citations omitted) (emphasis added)
In this case, as in Washington, the defendant was explicitly advised that he had a right to remain silent and that any incriminating statements he did make could place him in jeopardy. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966), does not apply because the defendant was not in custody. Michigan v. Summers, 452 U.S. 692,101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); Oregon v. Mathiason, 429 U.S. 492,97 S.Ct. 711, 50 L.Ed.2d 714 (1977).
It is true that the trial court repeatedly ordered the defendant to answer the questions he was being asked. However, these directions were necessary in order to confine the defendant's answers to the questions asked and to control his tendency to volunteer information and give unresponsive answers. At no time during the defendant's testimony in the Deep case was the defendant's privilege against self-incrimination invoked or objection made on that ground. It is clear that the free will of the defendant was not overborne when he testified at the Deep trial. He testified voluntarily for the defense and was adequately warned of his right not to incriminate himself before he elected to testify. We find no authority which would have required the trial court in the Deep trial to further advise the defendant of his Fifth Amendment privileges. Although the defendant argues that the trial judge had an affirmative duty to advise him of his constitutional right against compulsory self-incrimination, he admits that "no case we have found definitively requires a court to advise a witness of his Fifth Amendment right prior to testifying." We find no error in the admission of the defendant's prior testimony into evidence.
 III
The defendant maintains that the trial court erred in permitting the State to introduce evidence of other separate and distinct criminal offenses allegedly unrelated to the theft charged in the indictment. Specifically, the defendant submits that the State improperly introduced evidence of four separate conspiracies involving bribes, kickbacks, bid-rigging and the filing of false vouchers through the testimony of James Robert Meredith and Eddie Foster. It is also argued that the proof of these separate offenses produced a fatal variance between the indictment and the proof, "constructively amended the indictment, and resulted in a denial of due process."
Before addressing these issues an examination of the facts of the defendant's trial is necessary. In reviewing the sufficiency of the evidence to sustain the conviction, this Court must consider the evidence in the light most favorable to the prosecution, must accept as true the evidence introduced by the State, and must accord the State all the legitimate inferences from the evidence. Johnson v. State, 378 So.2d 1164,1169 (Ala.Cr.App.), cert. denied, 378 So.2d 1173 (Ala. 1979).
Because a full accounting of the testimony of each witness would turn this opinion into a short book, only the basic and essential facts follow. A great deal of the testimony we have omitted is exculpatory of the defendant's guilt. However, a similar *Page 321 
amount of the testimony we have omitted is as equally incriminating. Suffice it to state that the evidence was conflicting and the following statement of facts is only a bare outline of the State's case.
On September 13 and 14, 1979, Hurricane Frederic struck the coastal areas of Mobile and Baldwin Counties. Federal disaster relief was obtained almost immediately. On September 14th, the defendant was employed by the State Department of Civil Defense as the Director of The Disaster Housing Office. He kept this position until he was suspended on June 11, 1980.
As Director, the defendant was responsible for housing the disaster victims and he administered all federal funds for disaster housing. The Disaster Housing Office was funded by funds transferred from the federal government through the Federal Emergency Management Agency to the State Department of Civil Defense. These funds were placed in a separate account numbered 303102 to be used only for the assistance of disaster victims. Approximately nine or ten million dollars in federal funds were received while the defendant was employed as the Director of Disaster Housing.
The defendant hired Toofie Deep as the Deputy Director of the Disaster Housing Office. In April, 1979, prior to the Hurricane Frederic disaster, the defendant had served as Director and Deep as Deputy Director of the Disaster Housing Office when a number of Alabama counties were involved in a flood disaster.
On October 15, 1979, the Disaster Housing Office purchased a portable building manufactured by Morgan Building Systems, Inc. The building was to be used as a cook house by and for the disaster victims at the Sea Pines Mobile Home Park in Mobile who had moved into mobile homes where the electricity had not been connected. The purchase was under a lease-purchase agreement which called for four equal payments on the purchase price of $1,684.00. These payments were made on November 26, 1979, January 2 and 14, 1980, and February 27, 1980.
In January of 1980, Toofie Deep moved the building to his residence in Montgomery where he planted shrubbery around it and used it to store personal property. When the building was searched in June of 1980 no state property or records were found.
Robert John Thomson, the fiscal officer in charge of Accounting for the Disaster Housing Office, testified that in March of 1980 the defendant instructed him to consider the building a part of the Sea Pines Mobile Home Park. Therefore, the building was not included on the inventory although it should have been in the normal course of business. The inventory, which omitted the building, was signed by the defendant. Thomson stated that according to his records, the building should have been in the Sea Pines Mobile Home Park in January, February, March and April of 1980.
State Comptroller George C. Dean testified that the warrants dated January 14th and February 27th would not have been issued had he been aware that the building had been moved to Deep's personal residence.
The most incriminating evidence against the defendant consisted of the testimony he had given at the trial of Toofie Deep. The defendant admitted that he authorized the purchase of the building. He testified that when he authorized Deep to take possession of the building that Deep planned to use the building for personal use. The defendant admitted that he had filed false documents with regard to the building with the State Department of Civil Defense and the State Finance Director.
James Robert Meredith was in the business of transporting and installing mobile homes. The "tow-back" process involved disconnecting the mobile home from its site, clearing up the site, and towing the mobile home back to a staging area where it could be refurbished and made ready for new occupancy in the future.
Meredith testified that on December 13, 1979, a "pre-bid" meeting for the tow-back contracts was held in the defendant's office at which a number of interested contractors *Page 322 
were present when Meredith told the defendant that his average cost for a tow-back was $340.00. The defendant became angry because the bid was too low.
 "Mr. Killough said that this was the last of this damn disaster, and there wasn't going to be anymore of it; and, by God, we were going to get what we were going to get. And three hundred and forty dollars just damn sure wasn't enough."
* * * * * *
 ". . . . You sit here and say you're going to charge three hundred dollars a unit; and if you think that you are going go sit here and make a damn liar out of me after I told my people it cost fourteen hundred dollars, I will require you to put up a dollar for dollar bond, and I don't mean three hundred dollars; I mean fourteen hundred for every one you take."
Meredith stated that he was never awarded any of the "tow-back" contracts, even though he bid $475.00 "per tow-back" when the bidding was actually done after Christmas. Meredith had a conversation with the defendant before the defendant opened his $475.00 bid. During this conversation the defendant made the following statements:
 "Mr. Killough informed me that he didn't give a damn what was right or what have you; he was the director, he had been appointed; he had the ability to cover his ass; he was a professional; and that what anybody else thought of this didn't really make a hill of beans.
 "So, anyhow, during the argument . . . And, I again informed Mr. Killough that I was a contractor that had come over here to turn contracts; if I didn't do my job, to bust my bond or put me in default or whatever he had to do as director, but at least give me a chance to work. I was making an honest effort to work on an honest bid.
 "And he said: Well, you're too damn low, Jim. He said: There's no way these are going to go for three hundred and forty dollars. And, I said: Mr. Killough, I'll come up. I said: You just tell me what y'all want for a bid. He said: You bid what you feel like you've got to bid, and I'll make the decision. . . .
 "Well, the next morning at 10:00 o'clock I took my bid by to Mr. Killough. . . . He opened my bid at 10:00 o'clock in the morning — They were supposed to open them at 5:00 o'clock. He looked on the bid page, the back page that has the final price. My price was four hundred and seventy-five dollars. He handed it back to me and said: See, you're too damn low. And that was it. I can't do anything after that if he is not going to accept my bid; so, I left."
Meredith testified that the next morning he found out that Murray Steinbeck from Montgomery had been awarded the contract at $800.00 per unit.
On cross examination Meredith testified that he never discussed the Morgan portable building with the defendant, that his almost daily conversations with the defendant involved arguments as to why he was not issuing mobile homes to Meredith when he was issuing them to "Big Four" and "J and J" as "fast as they could pull them out at thirty-two and thirty-three hundred dollars a unit." This price was $1,200.00 to $1,400.00 more per unit than Meredith charged. Meredith testified that by the defendant's "own admission, I was doing a better job than them. I was not getting any houses."
The trial court instructed the jury three times during Meredith's testimony that Meredith's conversations with the defendant were being admitted for the sole purpose of determining whether the defendant had the intent to steal the Morgan portable building and that it was not to be considered as evidence of the defendant's bad character or propensity to commit the crime for which he was being tried.
William Ed Foster testified that the defendant was his supervisor at the Disaster Housing Office in Mobile. Foster confirmed Meredith's testimony and essentially related the same conversation Meredith had *Page 323 
with the defendant concerning the $340.00 tow-back bid being "too low".
 A THE CONSPIRACY
The foregoing facts authorize a jury finding that the State proved beyond any reasonable doubt that the defendant was a conspirator with Deep in the theft of the portable building. The defendant's own testimony proved that he authorized the purchase of the building and later authorized Deep to take possession of the building for his personal use. The defendant also admitted filing two false vouchers with the State Comptroller after Deep had moved the building. Further, the defendant made false statements to Bob Thomson, approximately two months after the building was moved in regard to the inventory kept by the Disaster Housing Office, that the building was to be still considered "part of Sea Pines." Without further recitation of the facts, we conclude that the State presented sufficient evidence to establish a prima facie case of the defendant's participation in a conspiracy in the theft of the portable building.
A conviction of one charged in the indictment with having been the actual perpetrator of a crime is authorized on proof of a conspiracy or that the accused aided or abetted in the commission of the crime. Stokley v. State, 254 Ala. 534,49 So.2d 284 (1950). An aider and abettor may be indicted directly with the commission of the substantive crime and the charge may be supported by proof that he only aided and abetted in its commission. Pope v. State, 365 So.2d 369 (Ala.Cr.App. 1978).
As this Court stated in Williams v. State, 383 So.2d 547,554-555 (Ala.Cr.App. 1979), affirmed, Ex parte Williams,383 So.2d 564 (Ala. 1980):
 "By statute the distinction between accessories before the fact and principals has been abolished in this state. Title 14, Section 14, Code of Alabama 1940, now Alabama Code Section 13-9-1 (1975). Thus all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, must be indicted, tried and punished as principals. Scott v. State, 30 Ala. 503 (1857); Watkins v. State, 357 So.2d 156 (Ala.Cr.App. 1977), cert. denied, 357 So.2d 161 (Ala. 1978). Where two or more persons enter into a conspiracy to accomplish some unlawful act, any act done by any one of them in pursuance of the original conspiracy is, in contemplation of law, the act of all. Stokley v. State, 254 Ala. 534, 49 So.2d 284 (1951); Martin v. State, 89 Ala. 115, 8 So. 23 (1889); Amos v. State, 83 Ala. 1, 3 So. 749 (1887). The criminal law does not attempt to assess guilt in complicity by any device of percentage of fault, rather, where joint action or aiding and abetting appear, all participating can be found equally guilty. Dubose v. State, 50 Ala. App. 652, 282 So.2d 91 (1973). Where two or more persons enter upon a common undertaking which contemplates the commission of a crime, each is equally guilty of the offense committed, even though he did not commit an overt act. Haney v. State, 20 Ala. App. 236, 101 So. 533, cert. denied, 211 Ala. 614, 101 So. 537 (1924).
 "A conspiracy is provable either by direct or circumstantial evidence. Collins v. State, 138 Ala. 57, 34 So. 993 (1903). Indeed a conspiracy is rarely proven by positive or direct testimony but usually by circumstances. Muller v. State, 44 Ala. App. 637, 218 So.2d 698, cert. denied, 283 Ala. 717, 218 So.2d 704
(1968). However, before the acts of a confederate are admissible against a defendant, prima facie evidence only of a conspiracy is necessary. Williams v. State, 81 Ala. 1, 1 So. 179 (1887).
 "Any word or act contributing to the commission of a felony, intended to incite or encourage its accomplishment, makes one a co-conspirator. Conley v. State, 354 So.2d 1172 (Ala.Cr.App. 1977). The words `aid and abet' comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or *Page 324 
constructive, to render assistance should it become necessary, and no particular acts are necessary. Radke v. State, 292 Ala. 290, 293 So.2d 314 (1974). The defendant's actual participation need not be proved by positive testimony; the jury is to determine whether it exists and the extent of it from the conduct of the parties and all the testimony adduced. Watkins, 357 So.2d at 159. The trial judge must determine initially whether there is prima facie evidence that a conspiracy exists. Once he so determines the existence of such a conspiracy becomes a question for the jury. Strange v. State, 43 Ala. App. 599, 606, 197 So.2d 437, cert. dismissed, 280 Ala. 718, 197 So.2d 447 (1966)."
While Alabama Code 1975, Sections 13A-2-20 and 13A-2-23, are now the applicable code sections for determining who are parties to an offense, rather than Section 13-9-1, the adoption of these sections by the legislature does not change the law on conspiracy as described in Pope and Williams. The commentary to these two new sections makes this clear.
Upon reviewing all of the facts and circumstances surrounding the taking of the building and Deep's personal use of it in his backyard, we are convinced that the proof adduced by the State satisfied every element necessary for a conviction for theft of property in the first degree as charged in the indictment. When two or more persons join in an unlawful enterprise, each is responsible for everything which may consequently and proximately flow from the unlawful purpose, whether committed by the accused or not, and whether specifically intended or not. All persons concerned in the commission of a felony, directly or indirectly, are equally guilty and it is not necessary that the aider be present. Conley v. State,354 So.2d 1172, 1177 (Ala.Cr.App. 1977). The law looks upon a conspirator as an actual participant in the completed offense. Williams,383 So.2d 564, 565 (Ala. 1980). In short, the acts of Deep were the acts of the defendant.
 B VENUE
Since the evidence is sufficient to support the inference of the existence of a conspiracy between Deep and the defendant, it follows that the venue for the defendant's trial could be the venue for Deep's trial. Venue for the conspirator's trial is proper venue for the principal's trial. Williams, 383 So.2d at 565.
 "If this is not the result in such cases (involving conspiracies) we would be forced to conclude that the framers of our Constitution, and codifiers following them, carved out a venue exception in conspiracies cases necessitating separate trials in perhaps a multiplicity of different counties, when at the same time their actors are legally looked upon as co-principals participating in the completed offense. As applied to these legal principles such a construction is unreasonable." Williams, 383 So.2d at 565-566.
There is, thus, no merit to the defendant's contention that proper venue was not in Montgomery County.
 C THE OTHER OFFENSES
Having established that the jury was justified in finding that the defendant conspired with Deep in the theft of the building, and that Montgomery County was proper venue, we must now consider the relevancy of the alleged bribes, kickbacks, bid-rigging and the filing of false vouchers.
Clearly, there was no error in admitting the fact that the defendant filed false vouchers which specifically related to the building after the building was transported by Deep to Montgomery. This evidence proves that the defendant was part of a continuing conspiracy to cover up Deep's illegal and personal use of the building.
 "A conspiracy involving the commission of a substantive crime may extend beyond the actual commission of the offense and the fact that a conspiracy has ended *Page 325 
does not preclude its continuance for various secondary purposes. Hence, continuing conspiracies have been recognized where the evidence warrants a finding of accused's participation in a conspiracy to suppress or fabricate evidence of the crime after its commission, Levison v. State, 54 Ala. 520 (1875); Lancaster v. State, 214 Ala. 2, 106 So. 617 (1925); Latham v. State, 56 Ala. App. 234, at 246-247, 320 So.2d 747, affirmed, 294 Ala. 685, 320 So.2d 760
(1975); Dailey v. State, 233 Ala. 384, 171 So. 729
(1937), or a continuing conspiracy to divide the fruits of the crime. C. Gamble, McElroy's Alabama Evidence, Section 195.03 (6) (3rd ed. 1977)." Williams, 383 So.2d at 557. (emphasis added)
Acts and circumstances in pursuance of the accomplishment of a crime are admissible. Williams v. State, 255 Ala. 229, 234,51 So.2d 250 (1951). Evidence tending to establish the guilt of the accused is not rendered incompetent because it may tend to show his guilt of another offense. Snead v. State, 243 Ala. 23,8 So.2d 269 (1942); Pope, supra. Any conduct or declaration of an accused having a relation to the offense charge, indicating a consciousness of guilt, is admissible as evidence against him. Conley v. State, 354 So.2d 1172, 1179 (Ala.Cr.App. 1977).
 "`Any indications of a consciousness of guilt by a person suspected of or charged with crime, or who may after such indications be suspected or charged, are admissible evidence against him. The number of such indications it is impossible to limit, nor can their nature or character be defined. Presumptions or inferences may be, and often are, founded on circumstances which, of themselves, independent of the accusation, would not be ground of crimination. It is largely a question of fact, rather than a question of law, for the determination of the jury, whether particular conduct, or particular expressions of the accused, refer to a criminal offense, and spring from his consciousness of guilt. When it is clear that they have no relation to the offense, and that they ought not to have any influence with the jury, it is the duty of the court to reject them as evidence. But however minute or insignificant they may be, shedding but a dim light upon the transaction, if they have a tendency to elucidate it they must be admitted. They may be connected with other circumstances which will constitute a chain of evidence, leading the mind to a satisfactory conclusion.'" McAdory v. State, 62 Ala. 154, 159-160
(1878).
While the actual taking of the portable building for Deep's personal use occurred during the first week in January, 1980, the defendant's subsequent submission of false vouchers for the building was relevant in indicating his consciousness of guilt and in disclosing his intent.
While the alleged bribes, kickbacks, and bid-rigging were never described in those specific terms, the jury could have gleaned those very inferences from Meredith's and Foster's testimony. Basically, the jury could have inferred that the defendant engaged in the above illegal activities from the bidding methods he employed in awarding the "tow-back" contracts. Yet, even though the testimony of Meredith and Foster may have demonstrated that the defendant was, in fact, engaged in committing other criminal offenses at approximately the same time he was engaged in the conspiracy with Deep to steal the portable building, we find that their testimony was relevant to show the defendant's intent, plan, design or scheme to unlawfully enrich himself and others at public expense.
It is apparent that the defendant's overall plan or scheme as director of the Disaster Housing Office was to take every possible advantage of the funds available. In the defendant's own words: "(T)his was the last of this damn disaster, and there wasn't going to be any more of it; and, by God, we were going to get what we were going to get." Meredith's and Foster's testimony demonstrates that the defendant's intent to allow Deep to take the portable building to Montgomery for his personal use was purposeful and blatant, rather than accidental or innocent. The defendant made it clear *Page 326 
that "he didn't give a damn what was right . . . he was the director . . . he had the ability to cover his ass." The defendant's conspiracy with Deep to steal the building was just one part of the overall conspiracy or scheme to illegally get as much as possible out of the disaster relief money. In this regard, the principle involved in this case is identical to that found in McDonald v. State, 57 Ala. App. 529, 329 So.2d 583
(1975), cert. quashed, 295 Ala. 410, 329 So.2d 596 (1976).
The rules of evidence regarding the admission of evidence of an accused's commission of crimes not charged in the indictment are clearly and concisely summarized in C. Gamble, McElroy'sAlabama Evidence, Section 69.01 (1) (3rd ed. 1977):
 "On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question. This rule is generally applicable whether the other crime was committed before or after the one for which the defendant is presently being tried."
* * * * * *
 "The foregoing exclusionary rule does not work to exclude evidence of all prior crimes, only such as are offered to show the defendant's bad character. If the defendant's commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than as tending to prove guilt via bad character, then proof of such other act is admissible."
* * * * * *
 "`. . . It must ever be borne in mind that the state may prove the accused's commission of another crime if such other crime is relevant for any purpose other than that of showing his guilt through the medium of bad character.' . . ."
Evidence of the accused's commission of other crimes is admissible to show criminal intent, and plan, design, scheme or system. Allen v. State, 380 So.2d 313 (Ala.Cr.App. 1979), cert. denied, 380 So.2d 341 (Ala. 1980); Pope, supra.
 "`If the accused is charged with a crime that requires a prerequisite intent, then prior criminal acts are admissible to show that he had the necessary intent when he committed the now-charged crime. This rule is based upon the theory that, because the unintentional doing of an act is abnormal and unusual, the more a person does other acts similar to the act in question, the greater the likelihood that the act in question was not done inadvertently.'" McElroy, supra, Section 69.01 (5).
* * * * * *
 "`Evidence of the accused's commission of another crime is admissible if such evidence, considered with other evidence in the case, warrants a finding that both the now-charged crime and such other crime were committed in keeping with or pursuant to a single plan, design, scheme or system. This rule is applicable whether such plan, design, scheme or system is narrow and specific in scope or is measurably broad and general in scope.'" McElroy, supra, Section 69.01 (6).
We find the following stated in Underhill, Criminal Evidence, 4th Ed., Section 184, p. 333:
 "All evidence is relevant which throws, or tends to throw, any light upon the guilt or innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove that at some other time or at the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If the evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may *Page 327 tend to prove, that the accused committed some other crime or may establish some collateral and unrelated fact."
(Emphasis added)
With these principles in focus it becomes clear that the defendant's overall plan or conspiracy was broad and comprehensive in scope rather than narrowly confined to just the theft of the Morgan portable building. In order to throw light on the defendant's true, unlawful intent, i.e., to get all he could while the disaster relief funds were available, we find that Meredith's and Foster's testimony was relevant. For the jury to accurately determine the defendant's true intent regarding Deep's taking of the building, it was permissible and necessary for the State to show parts of the broad, overall picture. To have allowed only the events surrounding the actual taking of the building would have presented the jury with a partial and limited view of the circumstances and nature of the criminal act charged. Evans v. State, 343 So.2d 557
(Ala.Cr.App. 1977) and Christison v. State, 41 Ala. App. 192,142 So.2d 666, affirmed, 273 Ala. 564, 142 So.2d 676 (1962) (In prosecution for embezzlement, evidence of other forged checks admissible to show intent to defraud); Enzor v. State,27 Ala. App. 60, 64, 167 So. 336, cert. denied, 232 Ala. 257,167 So. 340 (1936) ("In a prosecution for embezzlement, it is not error to allow testimony of other embezzlement of different property, similarly received, as going to show that the act was knowingly and intentionally done."); Sweeney v. State,25 Ala. App. 220, 143 So. 586, cert. denied, 225 Ala. 381,143 So. 588 (1932) (In grand larceny prosecution, evidence tending to show that accused had taken and disposed of other property, committed to his custody, without accounting to his employer, admissible on question of intent).
We do not find that the defendant's indictment was constructively amended or that a fatal variance resulted from the State's proof. Unlike the facts in Berger v. United States,295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), cited in the defendant's brief, the facts in this case prove that the defendant was centrally connected with the unlawful activities described by Meredith and Foster, in addition to the conspiracy to steal the Morgan portable building. This is not a situation as in United States v. Levine, 546 F.2d 658 (5th Cir. 1977), where the prosecution transferred guilt from one group of defendants to another. The central focus of guilt here was unquestionably on the defendant during all phases of the trial.
The trial court took every precaution possible to apprise the jury in clear language as to exactly what purpose they could consider Meredith's and Foster's testimony. These instructions were given on a number of occasions throughout the trial. There is no reason to believe that these instructions were not followed. We hold that the admission of Meredith's and Foster's testimony was proper.
 IV
The defendant's contention that the State of Alabama did not have jurisdiction in this case because title in the Morgan portable building was in the federal government is without merit. Despite the defendant's technical argument that under federal disaster assistance regulations property purchased with federal funds is federal property until the state obtains title to the property by purchase or donation, it is uncontroverted that the State of Alabama was in possession of the building at the time it was stolen.
Theft of property is an offense against possession. Nicholsonv. State, 369 So.2d 304 (Ala.Cr.App. 1979).
 "The law in Alabama as enunciated in Hobbie v. State, Ala.Cr.App., 365 So.2d 685, is well settled that the ownership of stolen property may be laid in the party in possession either as the owner, bailee or agent. No material variance exists where the indictment charges that the property taken was that of a named individual when the proof later shows that the property in reality belonged to another or to a corporation. The indictment is proper when it shows the party in possession." *Page 328 Williams v. State, 387 So.2d 258
(Ala.Cr.App.), cert. denied, 387 So.2d 261 (Ala. 1980). (Emphasis added)
Although the above principles in Williams and Hobbie are taken from cases where the crime charged is robbery, we find those same principles applicable where the offense is theft. The property in question is "stolen" for either offense. In cases involving stolen property ownership and right to possession amount to the same thing. Leverett v. State, 18 Ala. App. 578,580, 93 So. 347, 349 (1922).
Furthermore, that a criminal act may violate federal law as well as state law does not preclude prosecution by the state if no federal prosecution has been commenced. Quinn v. State,39 Ala. App. 107, 95 So.2d 273 (1957); Bowling v. Slayton,344 F. Supp. 650 (W.D.Va. 1972). Thus, we hold that the State of Alabama had jurisdiction to prosecute the defendant in this cause.
 V
During the cross examination of State's witness Robert Thomson, defense counsel made the following objection outside the presence of the jury: "Mr. Evans just got up, turned within three feet of the nearest sitting juror, who was sitting next beside him, and said: I can't believe this." Defense counsel maintained that the comment could have "possibly" tainted the jury: "I don't cast the accusation against Mr. Evans that he knowingly, intentionally, and purposely did it. He is as involved in this case as any of us are."
The District Attorney admitted that he made the comment, "I can't believe this", to one of his assistants, but not to the jury. The District Attorney maintained that he had not made the remark "to influence the jury in one bit": "I regret the fact that some juror might have heard it. I doubt seriously they heard it. It was whispered."
The trial court, after recognizing the problem presented by the arrangement of the courtroom, made no ruling on the objection. There was no request for a ruling. The record shows no motion to exclude the comment, no demonstration that the comment was actually heard by the jury and no motion for a mistrial. Thus, there is nothing before this Court to review.Asbill v. State, 390 So.2d 1168 (Ala.Cr.App.), cert. denied,390 So.2d 1176 (Ala. 1980). Review on appeal is limited to matters on which rulings are invoked in the trial court below.Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied,387 So.2d 283 (Ala. 1980).
We have examined every issue raised and have found no error prejudicial to the defendant. The defendant has been well represented at trial and on appeal by counsel who have fought diligently to safeguard his rights and privileges. His conviction in no way diminishes their competency. The judgment of the circuit court is affirmed.
AFFIRMED.
HARRIS, P.J., and TYSON and DeCARLO, JJ., concur;
BARRON, J., recused himself.
[1] Now Judge Barron of this Court, appointed effective March 12, 1982. To avoid even the appearance of impropriety, Judge Barron has recused himself from this case and has taken no part in its consideration before this Court.
[2] See Appendix A for the complete text of this order, photocopied from the record.
[3] For the sake of argument, however, even if Foster had been in possession of the diary at the time he was served with the subpoena duces tecum the request for the entire diary was far too broad in scope and the trial court could have properly limited its production to certain specified dates. See Williamsv. State, 383 So.2d 547, 558-559 (Ala.Cr.App. 1979), affirmed,383 So.2d 564 (Ala.), cert. denied, 449 U.S. 995,101 S.Ct. 534, 66 L.Ed.2d 293 (1980). Quoting from Ex parte Hart,240 Ala. 642, 200 So. 783, 785-786 (1941), this Court wrote:
 "`Touching the showing to be made on application for such writ (subpoena duces tecum), it is written: "On a motion or application for a subpoena duces tecum at least where its issuance is opposed or the rightfulness thereof assailed, it must be made to appear that the evidence which the books or papers of which production is asked will furnish is competent, and relevant and material to the issues before the court. * * * Facts which will enable the court to judge of the relevancy and materiality of the documents must be stated." 70 C.J. p. 52, Section 39.'" Williams, 383 So.2d, at 559.
It was specifically recognized in Williams that Alabama Code Section 12-21-2 looks to the production of books and documents for use as evidence on the trial of a case. "It excludes thenotion that it also embraces discovery as one of its purposes."
383 So.2d at 559 (emphasis added). *Page 329 
 APPENDIX A IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA
STATE OF ALABAMA ) )
VS. ) CASE NO. CC-80-1821-G )
LEE KILLOUGH )
 O R D E R
Defendant caused a subpoena duces tecum to be served on the State's witness, Eddie Foster, to produce at the trial of this case a diary which Foster kept relating to the Disaster Housing Office, a division of the Alabama Department of Civil Defense, for the period of September 12, 1979 through April 30, 1980.
The entries in the diary were made by the witness not for the prosecution of any person and were made to protect himself (apparently from criminal prosecution arising out of certain transactions which Foster construed to be illegal that took place at the Disaster Housing Office during Hurricane Frederick disaster) at the suggestion of Bishop Barron (Mr. Barron is an attorney, but from the record no attorney/client relationship existed between Barron and Foster and Barron only advised Foster "as a friend"). When Foster ceased maintaining the diary, he placed it in Mr. Barron's safe and authorized Barron to do what he thought best with the diary.
The District Attorney moves the court to quash the subpoena on the ground that the diary is part of Foster's grand jury testimony and thus protected by the Grand Jury Secrecy Act, 1979 Alabama Acts, No. 79-457.[1] Section 2 of the Act prohibits a grand jury witness from revealing his testimony before the grand jury. Section 3 of the *Page 330 
Act prohibits any present or past grand jury witness from revealing the nature of any physical evidence presented to the grand jury.
The court heard testimony of Foster in order for the defendant to lay a proper predicate for production of the diary. During the hearing defense counsel candidly admitted that he was not aware of the contents of the diary; however, counsel's questions of the witness were specifically directed to the dates January 4 and 6, 1980, and March 4, 1980.
Foster's testimony shows, inter alia, that he testified before the grand jury of Montgomery County, Alabama, and although he did not physically take the diary into the grand jury room or testify directly therefrom,[2] it appears that an assistant district attorney questioned him from the diary during the court of the grand jury proceedings. The diary has been in the custody of the District Attorney since Foster's grand jury testimony.[3]
Defendant urges that the court is squarely faced then with the issue of whether a private document, prepared by a citizen not in preparation for prosecution, is immunized from the defendant's subpoena by its use in the grand jury proceedings.
Before addressing the issue thus put, should considerations of the exculpatory nature of the entries in the diary be weighed, i.e., should the court re-define the issue in terms ofBrady v. Maryland, 373 U.S. 83 (1963) requests? *Page 331 
During argument on the motion, defense counsel alluded to the request for all Brady material contained in the motion for production, and further cited the court to Monroe v. Blackburn,607 F.2d 148, (5th Cir. 1979), where the Fifth Circuit refined the rather amorphous concept of what is material favorable to the defendant. In Monroe, the omission of a matter in a key witness's statement was held to be favorable to the defendant under the facts of that case. In the case sub judice, defense counsel opines that the failure of defendant's name to appear on certain dates in Foster's diary is favorable in that the mention of others in connection with the alleged theft of the building excludes the defendant as a party to the illegal transaction.
The court in camera read Foster's diary.[4] The diary covers the time span from some unknown date in September through April 30, 1980, with an additional entry in May. The defendant's name is not mentioned under the dates January 4 and 7, 1980, or March 4, 1980 (in connection with an inventory). The in camera
examination does not persuade the court that the entire diary should be made available to defendant.
In argument in support of defendant's motion, counsel asserted that implicit in their attack on the failure of Foster to comply with the subpoena is a ground that the Act is unconstitutional. Citing Washington v. Texas, 388 U.S. 14
(1980), defendant contends that the Act prohibits compulsory process of witnesses favorable to the accused. Without considering whether the court's holding in Washington would extend to the subpoena of documents, this court notes that there was no proof that all the information contained *Page 332 
in the diary would be favorable. Defendant and his counsel are unaware of the diary's contents.
Defendant argues that the case of United States
v. Proctor Gamble Co., 356 U.S. 677 (1958) and Douglas OilCo. v. Petrol Stops Northwest, 411 U.S. 211 (1979) would require production of grand jury testimony where injustice would result and the public need outweighs on balance, the need for secrecy.[5] The court notes that the burden is on the applicant to demonstrate the need for production and under the fact of the case sub judice, defendant has failed to meet this burden.
In the case sub judice, no authority has been presented directly on point and in the limited time allowed the court to consider the matter, the court has not located any authority. The court then analogizes the diary to a written statement of a witness sought by defendant. This analogy is made, as follows:
1. Foster's testimony that all entries are his and in his handwriting comports to a writing otherwise authenticated by a witness, and,
2. Testimony from the diary to the grand jury comports to a sworn statement made before a law enforcement officer. This being the case, the defendant must meet the further requirement of Beard v. State, 337 So.2d 1372, 1377 (Cr.App. 1976) by proof of a statement before trial inconsistent with a statement made at trial. Defendant cannot meet this burden because the matter is premature.[6] *Page 333 
In summary, the court is of the opinion and holds, as follows:
1. That the Grand Jury Secrecy Act is not unconstitutional.
2. That defendant failed to meet the burden required byBeard, supra.
3. Defendant failed to show that manifest injustice would result from non-production or a compelling need for production by the witness. Proctor Gamble, supra, and Douglas Oil,supra.
4. Defendant has particularized three dates, January 4 and 6, 1980, and March 4, 1980. Under the facts the court is satisfied that sufficient particularization has been made and a sufficient showing pursuant to Monroe v. Blackburn, supra, to warrant production of copies of the diary entries the dates of January 5, 6, 1980, and March 4, 1980.
It is therefore ORDERED that the District Attorney excerpt the diary entries from the dates of January 5, 6, 1980, and March 4, 1980, and make them available to defendant prior to commencement of trial.
DONE and ORDERED this the 17th day of March, 1981.
 __________________________ WILLIAM R. GORDON Circuit Judge
[1] The question of the District Attorney's standing to request that the subpoena be quashed was not answered by the District Attorney, but resolution of this issue is not required under the court's holding.
[2] The diary was not subpoenaed. It would be speculation that Mr. Barron had already made the diary available to the District Attorney.
[3] During Foster's testimony he said "it was news to him" that the District Attorney had the diary.
[4] With regard to this approach to Brady requests, seeWhitebread, Constitutional Criminal Procedure, § 18.4
[5] Foster's testimony that he gave the diary to a friend, Mr. Barron, could arguably be construed as production of material that would mitigate the State's argument for secrecy. However, more importantly is the State's position that the diary contains other matters that are part of an on-going grand jury investigation.
[6] Should Foster testify inconsistent with prior statements, defendant may raise the issue at that time.