[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 656 
 ON APPLICATION FOR REHEARING
Our original opinion in this cause is withdrawn and the following opinion substituted therefor.
Clair Glynn Ward Chisler was convicted of extortion in the second degree, a violation of Ala. Code (1975), § 13A-8-15, and was sentenced to two years' imprisonment.
The indictment alleged, in substance, that Chisler aided or abetted Jeff C. Mims, Jr., the administrator of the Alabama Alcoholic Beverage Control Board (ABC Board) in obtaining from Suntory International, Inc. (Suntory) a liquor manufacturer, Suntory's right to hire the agent, representative, or broker of its choice in Alabama, by means of a threat to take official action against, or to withhold official action from, Suntory.
The State's evidence established that liquor products must be officially listed with the ABC Board in order to be sold in Alabama. Liquor companies usually hire representatives, agents, or brokers, who, by *Page 657 
means of promotional presentations to the ABC Board, try to get their products listed in Alabama. The ABC Board conducts regular listing hearings, after which the administrator and deputy administrator recommend to the Board which products should be listed. The Board members then vote on whether to accept the recommendations. A product is officially listed only if the Board votes to have it listed.
Carl Wright, deputy administrator of the ABC Board, testified that Jeff Mims, the administrator of the ABC Board, introduced him to the defendant in the spring of 1983 and told him "to assist her in getting some lines to represent here in Alabama." Initially, Wright did nothing. Mims later asked Wright whether he had done anything to help the defendant. Wright then contacted the liquor companies which he thought did not have brokers in Alabama and told them that he knew "someone that could assist them in securing some listings in the State." If the company representatives informed Wright that they already had a broker, Wright inquired whether they wanted an additional broker who could help them obtain new listings. If they expressed no interest in an additional broker, Wright informed them that they would get no further listings in Alabama.
Wright told Frank Mancini at Suntory that "if [Suntory] expected to have any products listed in the State of Alabama, Clair Chisler would have to be [the] broker." Wright informed both Mims and the defendant of this conversation.
Frank Mancini testified that Suntory initially wanted to hire Mike Miaoulis as its Alabama broker. However, when told by Wright that Suntory should hire the defendant if it expected any listings, Mancini decided to interview the defendant. The defendant "guaranteed" Mancini that Suntory would get two or three listings. Suntory hired the defendant as its broker, and four of its products were listed in Alabama.
Mike Miaoulis testified that Mancini had originally agreed to hire him as Suntory's broker in Alabama. Later, however, Miaoulis told Mancini that he could not "guarantee" Suntory any listings in Alabama and that all he could guarantee was that he would "go before the Alabama ABC Board, and give it my best shot." Miaoulis was not hired.
Leo Conte, of Montebello Brands Bottlers, testified that Wright recommended that his company hire the defendant as its broker. Montebello hired her and it obtained 23 new listings in three months. In the previous 25 years of doing business in Alabama, Montebello had received only 27 listings.
Edwin Morgan, of Brown-Foreman Distillers, testified that Wright told him "the broker [his company] had to go through was Mrs. Clair Chisler." Morgan refused to hire the defendant, and his company obtained no listings that year.
Robert Norton, of Federal Distillers, testified that Wright suggested the defendant as a broker for Norton's company. Federal Distillers, which had obtained only six Alabama listings in the previous five years, received nine new listings in one month after hiring the defendant.
Chris White, of Heublein Wine Company, testified that Wright suggested to him that his company hire the defendant as its broker. White replied that Heublein had decided to hire Alabama Crown. Wright then said that "there would be no way that [Heublein] would get listed with the State unless [it] appointed [the defendant]." White also testified that he had several telephone conversations with a woman who identified herself as Clair Chisler. According to White, the defendant stated that "in Alabama you g[e]t things done based on your connections, and that if you get the right connections you can be successful in the State. If you don't have the right connections, and you don't go with the program, then you are going to be out of business." Despite this, Heublein hired Alabama Crown. It obtained no listings in Alabama that year.
John Waites testified that in the fall of 1983 he drove the defendant to Evergreen, Alabama, to meet the ABC Board administrator, Jeff Mims. "Waites said that the defendant told him that she and Mims had to get their stories straight, due to an *Page 658 
upcoming investigation about her books." When they arrived at their destination, Waites said, Mims got into the car and kissed the defendant. He also said that the defendant told Mims she was worried that they had been seen together at a restaurant and at a motel and that Mims's car had been photographed in front of her house, and that later, the defendant asked Waites to tell the grand jury that he was Mims's bodyguard and that she and Mims had never been alone together. Waites testified that he had not been a bodyguard for Mims.
The defendant testified that she heard Mims tell Wright to help her become a broker. She denied, however, knowing that Wright had ever threatened any liquor companies into hiring her, denied having "guaranteed" Mancini that she could obtain any listings for Suntory, and denied having told any liquor companies that if they wanted their products listed they would have to hire her.
 I
The defendant claims that the indictment failed to charge an offense because, she argues, the "contractual right" described in the indictment did not constitute "property."
Section 13A-8-13 states that one commits the offense of extortion "if he knowingly obtains by threat control over the property of another, with intent to deprive him of the property." "Property" is defined in § 13A-8-1(10) as:
 "Any money, tangible or intangible personal property, property (whether real or personal) the location of which can be changed (including things growing on, affixed to or found in land and documents, although the rights represented hereby have no physical location), contract right, chose-in-action, interest in a claim to wealth, credit or any other article or thing of value of any kind." (Emphasis added.)
The property alleged to have been obtained was "the contractualright of Suntory . . . to retain, hire or employ agents, brokers, or representatives of its choice."
The defendant attempts to draw a distinction between a "contract right" listed in the statute as a possible subject of extortion and the "contractual right" of Suntory described in the indictment. She claims that a contract right arises only from an existing contract (which Suntory did not have), whereas a contractual right is "a naked right existing merely in comtemplation of law, [and] although it may be very valuable to the person who is entitled to exercise it, it is not a subject of larceny." Brief of Appellant at 30-31, quoting Latham v.State, 56 Ala. App. 234, 320 So.2d 747, 755 (Ala.Cr.App.), affirmed, 294 Ala. 685, 320 So.2d 760 (1975).
The argument defeats itself. Latham v. State recognized that even a right existing merely in contemplation of law is "veryvaluable to the person entitled to exercise it." The definition of "property" under our extortion statute is broadly worded to include a "thing of value of any kind," Ala. Code §13A-8-1(10), and repudiates the artificial and illogical restrictions imposed upon the kind of property which at common law could be the subject of larceny. See Ala. Code §§ 13A-8-2
through 13A-8-5 (Commentary at 266-267).
The defendant further claims that the contractual right at issue here, the ability of Suntory to secure the professional services of the broker of its choice, could not be the subject of extortion because "professional services" is not included in the definition of "property" set out in § 13A-8-1(10). CitingPeople v. Squillante, 18 Misc.2d 561, 185 N.Y.S.2d 357 (1959), the defendant argues that although the right to contract for professional services is one that may be lost by the victim of extortion, it is not one that may be obtained by the extortionist. In Squillante, the accused was convicted of extorting money from stores by demanding, under threat of picketing, that the stores discontinue dealing with a certain garbage collector and deal only with the accused sanitation company. The New York court held the indictment deficient. Responding to the State's argument that "the stores lost the freedom to contract with the cartmen *Page 659 
of their choices, and that that right is 'property' within the [New York extortion] section," the Court held:
 "It would appear that the right to contract may be property injured under Section 851 of the Penal Law . . ., but it is difficult to consider that right property obtained under Section 850. 'Obtaining of property from another' imports not only that he give up something but that the obtainer receive something. . . . [T]wo federal cases cited by the People are distinguishable; [one] because the statutory definition encompassed not only property but 'other valuable consideration. . . .' " People v. Squillante, 185 N.Y.S.2d at 361 (emphasis added) (citations omitted).
Unlike the New York statute in Squillante, our extortion statute is broadly worded to proscribe obtaining control over intangible property or any "thing of value of any kind" from another. It is, thus, analogous to the federal case, distinguished by the New York court, which "encompassed not only property but 'other valuable consideration.' " See Nick v.United States, 122 F.2d 660, 665 (8th Cir. 1941), cert. denied,314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550 (1941). The contractual right of Suntory to name its own liquor representative without fear of official retaliation as alleged in the indictment qualifies as "property" under § 13A-8-1(10). The indictment was not defective on this ground.
 II
The defendant maintains that the State did not establish the proper predicates for the admission of evidence concerning a telephone call to Edwin Morgan by someone who identified himself as Carl Wright, and a telephone call to Chris White by a woman who said she was Clair Chisler.
Citing Dentman v. State, 267 Ala. 123, 99 So.2d 50 (1957), the defendant maintains that the trial court erred in allowing both Morgan and White to testify to telephone conversations from callers they did not know, whose voices they did not recognize, and whose only identification was provided by the callers' statements.
In Dentman, the accused was convicted of murdering the chief of police following a dispute about a water line. One of the State's witnesses, a city councilman, testified that the day before the murder he received a threatening telephone call from a man who identified himself as the accused and demanded the resumption of his water service. Our Supreme Court recognized the following general rule regarding the predicate necessary for the admission of a telephone conversation:
 "[C]ommunications through the medium of the telephone may be shown in the same manner, and with like effect, as conversations had between individuals face to face, but the identity of the parties against whom the conversation is sought to be admitted must be established by some testimony either direct or circumstantial." Dentman v. State, 267 Ala. at 126, 99 So.2d at 53.
The Supreme Court reversed the judgment of the lower court, concluding that the identity of the caller had not been established "on the sole fact that the caller said he was Dentman." Dentman, 267 Ala. at 128, 99 So.2d at 55. See alsoVaughn v. State, 130 Ala. 18, 30 So. 669 (1901); Burton v.State, 48 Ala. App. 713, 267 So.2d 503 (1972); Wiggins v. State,43 Ala. App. 382, 191 So.2d 30 (1966).
In the present case, the identity of the person who called Edwin Morgan was proved by circumstantial evidence apart from the mere fact that the caller said he was Carl Wright. Seegenerally Annot., 79 A.L.R.3d 79, §§ 17-23 (1977). Carl Wright himself had earlier testified that he called representatives of all the liquor companies which did not have Alabama brokers, suggested they hire the defendant, and informed them that unless they employed the defendant they would not get any listings in this State. The content of the telephone conversation Edwin Morgan had with someone purporting to be Wright was thus corroborated by Wright's own testimony. This circumstance made it probable that the person who called Morgan *Page 660 
was in fact Wright. See Dege v. United States, 308 F.2d 534
(9th Cir. 1962) (wherein the court held that "the substance of the communication itself" was sufficiently corroborative of identification to constitute prima facie proof thereof).Compare Washington v. State, 539 So.2d 1089 (Ala.Cr.App. 1988) (contents of unsigned letters served to authenticate them as authored by accused). Edwin Morgan's testimony regarding the telephone call from Carl Wright was therefore admissible.
There was, however, no objection to Chris White's testimony on the ground of improper predicate establishing identity. Defense counsel objected on the grounds that the conversation was "entirely hearsay" and "an attempt to show commission of other crimes or other acts [not charged in the indictment]." (R. 164) The telephone conversation was admissible as an exception to the hearsay rule because it constituted anadmission by the defendant, and as an exception to the collateral crimes rule, because it was relevant to prove the defendant's intent. See authorities cited infra in Part VI. An objection stating specific grounds waives all grounds not specified, Ex parte Frith, 526 So.2d 880 (Ala. 1988), and the defendant cannot now complain that the identity of Chris White's caller was not sufficiently established.
 III
Prior to trial, the defendant filed a discovery motion requesting the State to disclose the name of any informant used in the case. The State denied the existence of an informant. The defense also requested the State to provide her with any statement made by her or by co-defendant Mims to any law enforcement officer. The court ordered the State to comply. The State denied the existence of any such statements.
At trial, John Waites testified that, in 1983, he was a boarder in the home of Mrs. Grace Faruki. The defendant and Mrs. Faruki were friends. Waites became socially acquainted with the defendant as a result of her frequent visits to Mrs. Faruki's home. In the fall of 1983, the defendant asked Waites to drive her and Mims to Evergreen, Alabama. During the drive, Waites overheard incriminating statements made by Mims and the defendant. In January 1984, he reported these statements to the Montgomery County district attorney's office. On cross-examination by defense counsel concerning the fact that Waites had "informed on someone who befriended [him]," Waites answered:
 "A [The defendant] committed what I thought was a felony in my presence. I was a State Commissioned Law Enforcement Officer and I reported it."
 "Q [By defense counsel]: What do you mean State Commissioned Law Officer?
"A I was a Forest Ranger.
". . . .
"Q Were you paid for any of this information?
"A No, sir.
"Q You did it as a good citizen?
 "A I did it as a law enforcement officer for the State of Alabama."
On appeal, the defense contends that John Waites was a law enforcement officer acting as an informant and was someone to whom the defendant and Mims made statements, and that neither of these facts was disclosed to the defense. The defendant claims that Waites's testimony should have been excluded as a sanction for violation of discovery rules. At the time Waites testified, however, there was no objection on this ground and no request for exclusion.
Defense counsel merely requested the court to "hold" the witness, not to release him from his subpoena, and not to allow him to leave the jurisdiction of the court. The court did not rule on the matter at that point, but later stated that it saw no reason to "keep Mr. Waites here." Defense counsel replied that the defense had two rebuttal witnesses who would impeach Waites's testimony. The defense wanted Waites to remain within the court's jurisdiction to be confronted with the inconsistent testimony or to be charged with perjury. The court responded: *Page 661 
 "I don't have any problem with him leaving. If he leaves the jurisdiction and he committed perjury, I'm sure [district attorney] Evans will get him back."
The court informed defense counsel that in the event other witnesses contradicted Waites's testimony, the court would instruct the jury to "weigh his credibility." Defense counsel replied, "He can go then, if that's what you feel," and "That's fair enough, Your Honor."
Later, after the State rested its case, defense counsel moved to exclude Waites's testimony pursuant to Rule 18.4, A.R.Crim.P.Temp., on the grounds that the prosecution, by not disclosing statements made by the defendant and Mims to Waites, had engaged in "directly misleading" the defendant and had violated the rules of discovery.
Rule 18.1(a), A.R.Crim.P.Temp., provides:
 "Upon motion of the defendant the court shall order the district attorney:
". . . .
 "(2) To disclose the substance of any oral statements made by the defendant before or after arrest to any law enforcement officer, official, or employee which the state intends to offer in evidence at the trial." (Emphasis added.)
Rule 18.1(b)(2) contains an identical requirement for disclosure of statements of a co-defendant. The question we must answer is whether Waites was a "law enforcement officer, official, or employee" within the meaning of Rule 18.1 so as to make the defendant's and co-defendant's statements reported by him to the district attorney discoverable.
It is true that rangers and wardens employed by the State Forestry Commission are "duly constituted peace officers" of the State of Alabama. Sections 9-13-5 and 9-13-10, Code of Alabama 1975, provide, in pertinent part, the following:
 Section 9-13-5: "All sheriffs, deputy sheriffs, constables, marshals and such other persons as may be designated or appointed by the governor or by the state forester are hereby declared to be forest wardens, and they shall report to the said state forester and to the district attorney for the county in which the same occur any violations of any provisions of this chapter." (Emphasis added.)
 Section 9-13-10: "All employees of the State forestry commission appointed as forest law enforcement officers by the state forester are hereby constituted peace officers of the state of Alabama with full police power and may exercise such powers anywhere within the state. They are hereby authorized to carry firearms or other weapons when they are actually in the discharge of their duties as such officers as provided by law. They shall be clothed with the power to arrest with or without warrant any person who shall violate any of the laws of the state of Alabama or any rule or regulation of the Alabama forestry commission and take him before a proper court for trial. All employees of the state forestry commission and all duly appointed officers of the United States whose duty it is to prevent and suppress forest fires are empowered to enter any lands and to construct thereon fire lines, fire lanes or fire breaks, to set back fires thereon if necessary to prevent the further spread of fire then actually burning and to do all other work necessary in the performance of their duties, including the right to enter any lands for the purpose of making investigations for the cause or causes of fires, without liability for trespass or damage therefrom."
In our judgment, however, Waites can not be deemed to have been acting as a "law enforcement officer, official, or employee" within the meaning of Rule 18.1 at the time thestatements were made. At the time Waites heard the statements he was acting as the defendant's acquaintance and driver only. He was not monitoring the defendant on behalf of the State or, for all that appears in the record, participating in the investigation against her in any manner. His informing the authorities of her incriminating statements was an after-the-fact decision, illustrated by the fact that he waited from the fall of 1983 to January of 1984 to report his information to the district *Page 662 
attorney. Under the circumstances, we hold that his mere status as a forest ranger, clothed as he might have been with law enforcement responsibilities in the abstract, does not make him, for purposes of the discovery rules, a "law enforcement officer, official, or employee."
This conclusion is strengthened by Ex parte Lambert,519 So.2d 899 (Ala. 1987), a case in which our Supreme Court held that the prosecution was required to disclose the accused's statements to a confidential informer wired during a drug transaction. Rejecting the State's argument that a confidential informer was not a "law enforcement officer, official, or employee as mentioned in the Rule," the Court held:
 "Mann was aiding the police in apprehending his drug supplier. He was working on behalf of, and for, the state, specifically to apprehend the defendant." 519 So.2d at 900 (emphasis added).
In Ex parte Lambert, the Court analyzed Mann's status at the time the accused's statements were made. His status outside the confines of that case as a civilian was not dispositive. The Court viewed him as an agent of the state because at the crucial time of the statement in issue he was specifically working for the State to apprehend the accused. Applying the same analysis here, we do not believe Waites's outside-the-case position as a forest ranger is determinative. His status at the time of the statement in issue was not that of an informant, but that of a civilian acquaintance unconnected with the investigation of the defendant.
In Bailey v. State, 303 Md. 650, 496 A.2d 665 (1985), the accused was arrested by a New Jersey state trooper after fleeing from a Maryland robbery. The applicable Maryland rule of discovery required the State to disclose "all statements made by the defendant to a State agent which the State intends to use at a hearing or trial." Rejecting the Maryland prosecutor's argument that it was not required to turn over to the accused statements made to a New Jersey trooper because the trooper was not a "State agent" of Maryland, the Maryland appellate court held that the scope of discovery rule 741 required disclosure. That rule provided:
 "The State's attorney's obligation under this section extends to material and information in the possession or control of members of his staff and any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office." 496 A.2d at 666 n. 1.
Like our Supreme Court in Ex parte Lambert, the Maryland court in Bailey v. State viewed the hearer of the statement not in the abstract, but within the confines of his responsibility at the time the statement was made. See also People v. DeBord,61 Ill. App.3d 239, 18 Ill.Dec. 672, 377 N.E.2d 1308 (1978) (statements made to a bank loan officer in a forgery case discoverable); State v. Nata, 452 So.2d 785 (La.App. 1984) (statements made to a security guard in a coin-operated laundry room of apartment complex discoverable in prosecution for burglary); People v. Brogan, 70 Misc.2d 282, 332 N.Y.S.2d 499
(1972) (statements made to building code inspectors while theywere enforcing the building code discoverable); State v. Fritz,72 Or. App. 409, 695 P.2d 972, cert. denied, 299 Or. 313,702 P.2d 1110 (1985) (statements made to fish and wildlife officerapprehending accused for hunting violation discoverable).Compare Clariday v. State, 552 S.W.2d 759, 766 (Tenn.Cr.App. 1976) (statements made to co-conspirator later granted immunity not discoverable because the co-conspirator "was in no sense an agent of the State at the time the undisclosed statements weremade").
In Rankin v. State, 541 So.2d 577 (Ala.Cr.App. 1988), cert. quashed, 541 So.2d 582 (Ala. 1989), the accused's friend, who was employed as a dispatcher for the Prichard Police Department, made a telephone call to the accused in his hospital room upon hearing that the accused had been shot during a homicide. The accused made incriminating statements during the telephone conversation. When she was questioned about the call by her superiors several days later, the dispatcher related the *Page 663 
accused's statement to the investigating officers.
This court held that in order to determine whether the dispatcher "was acting as a law enforcement officer or as an agent to the police department, 'we must look to the circumstances surrounding the giving of the confession.' "541 So.2d at 579. Taking into account the fact that the dispatcher was not instructed by the police department to make the call, she charged the call to her home telephone number, and she did not reveal the substance of the conversation until asked about it several days later, we held that her actions "were not connected to her employment by a law enforcement agency" but were the actions of a "private citizen." 541 So.2d at 580. "The admissibility of a confession is determined not so much by the person to whom it was made as by the manner and circumstances under which it was procured." Id. Here, whether a defendant's statement is discoverable is determined not so much by the employment title of the person to whom it was made, but by whether the hearer was acting pursuant to his employment at the time the statement was made.
Our discovery rules are more inclusive than the corresponding federal rule. Rule 16, F.R.Crim.P., mandates disclosure of "the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known by the defendant to be a government agent." Orfield, Criminal Procedure Under the Federal Rules 566 (Rhodes 2d ed. 1985). Under Alabama Rule 18, a statement to a government agent must be disclosed even if not in response to interrogation and regardless of the defendant's knowledge of the agent's status. See Ex parte Lambert, supra. Nevertheless, in our judgment, the absence of the interrogation and knowledge requirement does not authorize our stretching the definition of "law enforcement officer, official, or employee" to include all those whose employment status alone, regardless of their position vis-à-vis the accused at the time of the statement, would qualify them as agents of the State.
In Ex parte Lambert, the Court noted the following: "To say that Lambert made statements to a private citizen without connection to the State would be ludicrous." 519 So.2d at 900. Here, to say the same thing would be accurate. The fact that Waites decided to inform on the defendant some four months after he heard the statements, and that he characterized his actions at trial as within the scope of his duties as a "duly commissioned law enforcement officer" is not determinative. We are not bound by Waites's assessment of his status, but by the legal effect of his presence at the time he overheard the defendant's remarks. We characterize his presence as that of a private citizen unconnected with the State. See Rankin v.State, supra. His later report to the district attorney's office qualifies as a "statement made by [a] state witness or prospective state witness [whose discovery] is not authorized." Rules 18.1(c)(1) and 18.1(e), A.R.Crim.P.Temp. "[T]he general rule [is] that an accused is not entitled to discover statements of government witnesses before trial." Ex partePate, 415 So.2d 1140, 1144 (Ala. 1981).
Assuming for the sake of argument that Waites was acting as a law enforcement officer at the time he heard the defendant's statements, and that the substance of the statements should have been disclosed prior to trial, the court did not err in failing to exclude Waites's testimony. "A trial court may enter any order it 'deems just under the circumstances' whenever it learns that a party has failed to comply with its discovery order. Rule 18.5(a), A.R.Cr.P.(Temp.). Although Rule 18.5(a) provides that a trial court may prohibit the noncomplying party from introducing evidence not disclosed, this is an alternative remedy and is not mandatory." Fortenberry v. State,545 So.2d 129 (Ala.Cr.App. 1988). "The imposition of sanctions upon noncompliance with a court's discovery order is within the sound discretion of the court." McCrory v. State,505 So.2d 1272, 1279 (Ala.Cr.App. 1986). *Page 664 
Under the circumstances of the present case, the trial court did not abuse its discretion in failing to exclude the nondisclosed evidence. First, there was no showing that the prosecution even knew of Waites's employment as a forest ranger, so that the trial court could well have concluded that the State was never put on notice of the necessity for disclosure, and its nondisclosure was, therefore, not in bad faith. See generally W. La Fave J. Isreal, Criminal Procedure
§ 19.3(j) (1984). "[T]he appropriateness or extent of sanctions in such situations depends [among other things] upon a case-by-case assessment of the government's culpability. . . ."United States v. Grammatikos, 633 F.2d 1013 (2d Cir. 1980). Second, defense counsel requested no sanction at all at the time Waites testified and, in fact, did not even bring to the trial court's attention the issue of nondisclosure of discoverable material until after an overnight recess. The failure to request a continuance or other remedy at that time weighs against defendant's claim of prejudice here. See Masonv. State, 560 P.2d 1048 (Okla.Cr.App. 1977); Reed v. People,171 Colo. 421, 467 P.2d 809 (1970); People v. Dees, 46 Ill. App.3d 1010, 5 Ill.Dec. 598, 361 N.E.2d 1126 (1977).
Finally, once defendant did move for a sanction, she requested the most drastic one available. "The trial court should seek to apply sanctions that affect the evidence at trial and merits of the case as little as possible." W. LaFave J. Israel, Criminal Procedure at 504 (quoting State v.Birdsall, 23 Ariz. App. 454, 533 P.2d 1191 (1975)).
 IV
The defendant insists that her motion for judgment of acquittal should have been granted because the State presented insufficient evidence to prove her complicity in the crime of extortion in the second degree.
The indictment charged the defendant with being anaccomplice to extortion, not with conspiracy to extort. There are several distinctions between complicity, or accomplice liability, and conspiracy. The most practical distinction, and one which may account for the rarity of conspiracy indictments in Alabama, is the fact that while there is no difference in the punishment of principals and accomplices, see West v.State, 25 Ala. App. 492, 149 So. 354 (1933); Ala. Code (1975), § 13-9-1 (repealed); Ala. Code (1975), § 13A-2-23, the penalty for conspirators is generally one class lower than that imposed upon participants in the object crime. See Ala. Code (1975), §13A-4-3(g)(1)-(7). The exception is conspiracy to murder, which is punished the same as murder.
Another distinction between complicity and conspiracy is that in order for a defendant to be convicted as an accomplice, the guilt of the principal must be shown, Evans v. State,508 So.2d 1205, 1207 (Ala.Cr.App. 1987), whereas "[i]t is no defense to a prosecution for criminal conspiracy that [t]he person, or persons, with whom defendant is alleged to have conspired has been acquitted," Ala. Code § 13A-4-3(d)(1).
For present purposes, the fundamental difference between aiding and abetting and conspiracy lies in the fact that "while an agreement is an essential element of the crime of conspiracy, aid sufficient for accomplice liability may be given without any agreement between the parties." W. LaFave 
A. Scott, Substantive Criminal Law § 6.8 at 156-57 (1986). SeeHarris v. State, 177 Ala. 17, 59 So. 205, 207 (1913); Way v.State, 155 Ala. 52, 46 So. 273, 279 (1908).
Accomplice liability is defined in § 13A-2-23 as follows:
 "A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
 "(1) He procures, induces or causes such other person to commit the offense; or
 "(2) He aids or abets such other person in committing the offense; or
 "(3) Having a legal duty to prevent the commission of the offense, he fails to make an effort he is legally required to make." *Page 665 
Although the drafters of our complicity statute observed that § 13A-2-23 "formalizes in simple terms" the basic principles for determining accomplice liability, see Commentary to §13A-2-23, the determination is somewhat less than simple because the Alabama cases dealing with complicity have very often used the terminology and standards of conspiracy law to find liability. However, "[c]onspiracy and complicity are not identical; it is possible to have either without the other." R. Perkins R. Boyce, Criminal Law, § 5 at 702 (3d ed. 1982).
 "[I]t is possible for one to become a party to a crime directly committed by another without there being any agreement or communication of any kind between the two persons. For example, A is an accomplice to murder if, knowing that B and C have set out to kill D, he prevents a warning from reaching D, and this is so even though A's actions were not by preconcert with B and C and did not become known to B and C prior to the killing. This is because A has actually aided in the murder of D
and rendered the aid with the intent that D be killed."
W. LaFave A. Scott, Handbook on Criminal Law, § 61 at 462. The case upon which the foregoing hypothetical is based isState ex rel. Martin v. Talley, 102 Ala. 25, 15 So. 722 (1894), which is the classic illustration of the legal principle that for one to be an aider and abettor, or accomplice, one need not have agreed, or had a "meeting of the minds," with the perpetrator of the offense. See R. Perkins R. Boyce, CriminalLaw, supra, at 702. It is ironic that the law of complicity in Alabama, whose Supreme Court provided in Talley the textbook example of the distinction between complicity and conspiracy, should have become so infused with conspiracy terminology. See, e.g., Buffo v. State, 415 So.2d 1146 (Ala.Cr.App. 1980), reversed, 415 So.2d 1158 (Ala. 1982); Keller v. State,380 So.2d 926, 934 (Ala.Cr.App. 1979), cert. denied, Ex parteKeller, 380 So.2d 938 (Ala. 1980). See also Alabama Code §13A-2-23 (Commentary at 40) ("[O]ften the courts ambiguously have treated conspiracy, which properly is an inchoate crime, as a basis for complicity liability. . . . Properly, conspiracy is an incomplete crime, independent of the object crime, and is not a valid theory of complicity."); Commentary to Alabama Code § 13A-4-3(f) ("[T]he determination of complicity responsibility often has been couched in terms of conspiracy. Under this Criminal Code, the complicity provisions in § 13A-2-23 are the exclusive method of determining criminal responsibility for the conduct of others.").
The failure to distinguish the principles of conspiracy and complicity liability no doubt exists because the two "normally go hand-in-hand," R. Perkins R. Boyce, Criminal Law, supra, at 703, and in most of the cases the accomplice who aided and abetted the offense was also a conspirator who agreed beforehand With the perpetrator to commit the offense. See,Stokley v. State, 254 Ala. 534, 49 So.2d 284 (1950); Smith v.State, 368 So.2d 298, 304 (Ala.Cr.App. 1978), cert. quashed,368 So.2d 305 (Ala. 1979).
Notwithstanding ambiguous language to the contrary in some Alabama cases dealing with complicity, § 13A-2-23 authorizes accomplice liability in the absence of a conspiracy or an agreement between the parties. "Conspiracy requires proof of agreement; aiding and abetting does not." United States v.Beck, 615 F.2d 441, 449 (7th Cir. 1980).
Based on the foregoing authorities, the defendant's argument that the State failed to prove her guilt because it did not show she agreed with either Mims or Wright to commit the offense of extortion is unavailing. Because she was not charged with conspiracy, it was not necessary to prove that she acted by prearrangement or agreement.
The State did prove that she intended to "promote or assist" Mims and Wright in the extortion of Suntory and that she "aided and abetted" Mims and Wright in committing the offense.
"To make one accused of a crime an accomplice, 'the State must adduce some legal evidence implying that he either recruited, helped or counseled in preparing *Page 666 
the [crime] or took or undertook some part in its commission. Criminal agency in another's offense is not shown merely by an exhibition of passivity.' Pugh v. State, 42 Ala. App. 499, 502,169 So.2d 27 (1964)." Payne v. State, 487 So.2d 256, 262
(Ala.Cr.App. 1986). "Mere consent to a crime, when no aid is given and no encouragement rendered, does not amount to participation." Id. The State's evidence shows that the defendant's conduct was not merely passive and that it can be more reasonably characterized as eager encouragement. Wright stated that the defendant was "well aware" of the tactics he had used to get distillers to hire her because she questioned him about the efforts he had made on her behalf, asking "have you spoke[n] to a certain distillery, and if [Wright] said yes, then she wanted to know what [Wright] said, what they said, what was the outcome."
The fact that Wright reported to Mims the results of each threatening telephone call he made on the defendant's behalf and the fact that the defendant eagerly discussed these calls with Wright circumstantially proved her complicity. The fact that the defendant herself made a similar threatening telephone call to Chris White at Heublein Wine Company, stating that "[i]f you don't have the right connections, and you don't go with the program, then you are going to be out of business" directly established her intent.
The defendant's complicity in the charged crime was also circumstantially established by proof of her intimacy with Mims, her meeting with him to "get their stories straight," and her attempt to have Waites lie to the grand jury about their having been alone together. The jury could fairly conclude that such actions reflected a consciousness of guilt and an attempt to suppress the truth. See Holmes v. State, 29 Ala. App. 594,199 So. 736 (1941).
 "Any act proving, or tending to prove, an effort or a desire on the part of the defendant to obliterate evidence of a crime, is always relevant, for from such facts, if unexplained, the jury may justly apprehend his mental condition, and may infer that they indicate a consciousness of guilt. Underhill, Crim.Ev. p. 563, § 323. Thus it appears that such testimony was also admissible upon the theory of facts showing a consciousness of guilt. Evidence upon this theory never depends on its contemporaneousness, connection with the crime that is charged, or upon its being a part of the res gestae. Facts showing or tending to show a consciousness of guilt are always permissible, though not connected with the res gestae of the offense. Any statement or conduct of a person indicating a consciousness of guilt, where at the time or thereafter he is charged with or suspected of the crime, is admissible as a circumstance against him on his trial. Evidence of circumstances, which are part of a person's behavior subsequent to an event which it is alleged or suspected he is connected with or implicated in, [is] relevant, if the circumstances are such as would be natural and usual; the connection or implication having been shown to exist. Under a rule of evidence of this character testimony will be received to prove or disprove facts of circumstances which indicate a consciousness of guilt on the part of the accused, existing after the crime with which he is charged was committed." Montgomery v. State, 17 Ala. App. 469, 86 So. 132, 134 (1920), cert. denied, Ex parte State, 204 Ala. 389, 85 So. 785 (1920). See also Smith v. State, 183 Ala. 10, 62 So. 864 (1913) (evidence that accused asked a witness "not to tell anything" admitted as an effort to suppress evidence).
 V
There was no variance between the indictment charging that the defendant aided and abetted Mims and proof that Wright actually made the extortionate threats. The State's evidence clearly established that Wright was acting at Mims's direction, so that the acts of Wright were the acts of Mims. " '[A]ll persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid or abet in its commission, *Page 667 
though not present, must . . . be indicted, tried, and punished as principals.' " Stokley v. State, 254 Ala. 534, 49 So.2d 284,290 (1950).
 VI
The defendant claims that the trial court erred by admitting evidence of various collateral acts of misconduct not charged in the indictment, specifically (1) adultery, (2) attempted obstruction of justice, (3) two attempted extortions, and (4) forgery. We hold that evidence of all four was admissible.
(1) Adultery: Evidence of the intimate relationship between the defendant and Mims was admissible because it demonstrated Mims's motive for the charged offense. "Testimony going to show motive, though motive is not an element of the burden of proof resting on the state, is always admissible." McDonald v. State,241 Ala. 172, 174, 1 So.2d 658 (1941). The nature of their relationship was also probative of the defendant's complicity;i.e., their intimacy made it more likely that she was able to "procure, induce or cause" Mims to commit extortion.
(2) Attempted obstruction of justice: As discussed in Part IV of this opinion, the defendant's attempt to have Waites lie to the grand jury was admissible because it demonstrated her consciousness of guilt.
(3) Attempted extortion: Evidence of the attempted extortion of Edwin Morgan, representing Brown-Foreman Distillers and of Chris White, representing Heublein Wine Company, was admissible because it bore directly on the defendant's intent. "[T]he 'intent exception' applies only if the defendant's conduct is ambiguous, i.e., wrongful if done with an improper intent but not criminal if done innocently . . . or if it becomes necessary to show a particular intent in order to establish the offense charged. . . ." Brewer v. State, 440 So.2d 1155, 1159,1160 (Ala.Cr.App. 1983).
Here, intent was clearly at issue. The defendant admitted knowing that Carl Wright had called Mancini on her behalf, but claimed that she was under the impression he had merely "suggested" her name as a possible agent for Suntory. Evidence of her own telephone call to Chris White at Heublein tended to refute this claim, since it, like Wright's call to Suntory, contained a threat. Evidence that neither Brown-Foreman nor Heublein obtained any product listing following its refusal to hire the defendant was directly relevant to theparticular intent required for extortion: "A person commits the crime of extortion if he knowingly obtains by threat control over the property of another, with intent to deprive him of theproperty." Ala. Code § 13A-8-13 (emphasis added).
The defendant maintains that evidence of the attempted extortion of Morgan and White should have been excluded because those threats occurred after the offense charged in the indictment. Relying on Krulewitch v. United States,336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), the defendant argues that collateral crimes are admissible only if they are committed "during the course of and in furtherance of the conspiracy." Following this rationale, the defendant claims that, at the time the threats to Morgan and White were made, the conspiracy, if any, to commit the charged offense had ended. Thus, she reasons, testimony concerning other telephone calls made by Wright constituted hearsay not within the co-conspirator exception to the hearsay rule. See Krulewitch, supra.
This argument is based on the faulty premise that the law of conspiracy or the co-conspirator exception to the hearsay rule is operative here. As we have pointed out in Part IV of this opinion, conspiracy is neither the offense charged nor the basis of accessorial liability in this case.
The telephone calls made by Wright to Morgan and by the defendant to White were outside the hearsay rule not because they were declarations of co-conspirators made in furtherance of a conspiracy, but because they were admissions. Seegenerally Schroeder, Hoffman Thigpen, Alabama Evidence § 8-3 (1987). They qualify as exceptions to the "collateral crimes *Page 668 
rule" because they are relevant to prove the disputed issue of intent. They were admissible regardless of the fact that they occurred after the charged offense, because "[i]n Alabama, the collateral offenses offered to prove intent may either precede or follow the crime charged." Schroeder, Hoffman Thigpen,Alabama Evidence, § 4-4 at 126 and cases cited at n. 94 therein.
(4) Forgery: Marjorie Weldon, Mims's executive secretary, testified that in the late summer of 1983, Mims asked her to make some additions to the minutes of two meetings of the ABC Board. Mims requested that she add, and then renumber the pages to reflect continuity, a set of liquor product listings approved by the Board. Mrs. Weldon did as Mims asked, inserting 254 product listings for 42 liquor companies. The defendant represented six of those companies and had a total of 91 product listings. Later testimony by Board member Joe Smitherman established that at the time the addition to the minutes was made, the Board had not, in fact, approved the listings which Mims asked his secretary to insert. The director of inventory control for the ABC Board testified that the listings attributable to the defendant were "above normal."
The State argues that evidence of the forged minutes was admissible because it proved Mims's overall scheme to set up the defendant as a liquor agent and then to ensure that she made commissions from the sale of liquor products even if the products had to be listed illegally. Based on the holding ofEx parte Killough, 438 So.2d 333 (Ala. 1983), the evidence was not admissible on this basis. It was, however, admissible for other reasons, as we shall set forth.
In Killough v. State, 438 So.2d 311 (Ala.Cr.App. 1982), reversed, Ex parte Killough, 438 So.2d 333 (Ala. 1983), the director of disaster relief housing following Hurricane Frederic was charged with theft of a portable building which had been used by victims of the hurricane. The State presented evidence that the accused had also been involved in bribery, kick-backs, bid-rigging, and the filing of false vouchers incident to his administration of federal funds for disaster housing. The State contended, and this court agreed, that "the theft of the portable building was one facet of a larger scheme between Killough and Deep to unlawfully enrich themselves during the period when disaster funds were available; hence, . . . the extrinsic acts were admissible to show the larger conspiracy and thereby rebut any claim of theft by inadvertence." Ex parte Killough, 438 So.2d at 335. The Alabama Supreme Court reversed, rejecting the State's contention and our holding, as follows:
 "The fatal flaw in this reasoning is that such an extensive conspiracy was neither charged in the indictment, nor is the evidence of such other offenses relevant to this offense for which he was indicted. Evidence offered under the exceptions to the exclusionary rule must be relevant to a crime charged, rather than to an uncharged conspiracy. In other words, evidence of other crimes must be both relevant and material." Id. (Emphasis in original; citation omitted.)
In essence, the State is making the Killough argument again here: Evidence that Mims, Wright, and the defendant threatened liquor companies into hiring the defendant as their broker was merely one facet of a larger conspiracy to unlawfully enrich the defendant through commissions on sales of illegally listed liquor products. As in Killough, the "larger conspiracy" was not charged in this indictment. The forgery evidence was, therefore, not admissible on the basis that it proved a "larger conspiracy." It was admissible, however, because unlike the evidence in Killough, it was relevant to the crime that was
charged.
The material elements of the charged offense are (1) knowingly obtaining control over property of another (2) by threat and (3) with intent to deprive the other of the property. Ala. Code 1975, § 13A-8-13.
The crime of extortion "require[s] that the defendant's threats induce the victim to give up his property, something which he *Page 669 
would not otherwise have done." W. LaFave A. Scott,Substantive Criminal Law § 8.12(b) at 462-63. "Moreover, . . . it has been held that the victim's fear created by the defendant's threat must be the 'operating or controlling' cause of the victim's parting with his property." Id. at 459.
The forgery of the ABC Board minutes was relevant to the extortion of Suntory because it tended to prove both causation and intent. It shed light on causation because it showed that Mims (and inferentially the defendant) had the ability to carry out the threat contained in the extortion. That is, Mims's changing the minutes to reflect the listing of products which were not actually listed demonstrated that he was capable of executing the threat not to list a company's products if the company did not accede to his demands. The forgery evidence was, therefore, relevant because it tended to show that this capacity to execute a threat was the actual inducement operating on Suntory when it hired the defendant as its broker.
The forgery evidence was also relevant to the issue of the defendant's intent. "The peculiarity of intent, as a factum probandum, is that an act is assumed as done by the defendant, and the issue is as to the kind of state of mind accompanying it." Brewer v. State, 440 So.2d at 1159 (quoting 2 Wigmore onEvidence § 300 at 238 (Chadbourn rev. 1979)). Here, defendant admitted she knew that Wright, acting for Mims, had made calls on her behalf to Suntory. She admitted that as a result of such calls she was hired as Suntory's agent. She admitted that she later obtained product listings for Suntory. The only fact she did not admit was her knowledge of the threatening nature of the calls and thereby her intent to deprive Suntory of property.
On this point, the defendant's "guarantee" to Mancini at Suntory is relevant because it tends to weaken her claim of lack of knowledge and intent. One inference arising from the defendant's "guarantee" to Mancini is that she could safely promise him product listings because of her intimate relationship with Mims and her knowledge that Mims would resort to illegal means of enabling her to fulfill her promise. The forgery evidence corroborated and explained her "guarantee" to Mancini and thus tended to prove that she knew, in her dealingswith Suntory, that illegal measures were being used on her behalf. The forgery evidence, therefore, weakened her claim that she was unaware of any threats made to induce Suntory to hire her and strengthened the inference that the charged offense was committed with her knowledge and intent.
"The test of relevancy in Alabama 'is whether the offered evidence bears any relationship to the ultimate inference for which it is offered.' " Schroeder, Hoffman Thigpen,Alabama Evidence § 4-1 at 106 (1987); C. Gamble, McElroy'sAlabama Evidence § 21.01(1) at 15 (3d ed. 1977). Here, the offered evidence, forgery, when viewed together with evidence of the defendant's guarantee to Suntory, had a bearing on the ultimate inference for which it was offered — the defendant's knowledge of the use of threats to secure her employment and thereby her criminal intent to deprive Suntory of its right to freely contract with liquor agents of its choice unhindered by the fear of retaliation.
 VII
Finally, defendant objects to the court's oral charge to the jury outlining the principles of accessorial liability, specifically to the court's use of the term "common enterprise." The defendant took exception to the following instructions:
 "Now, aiding and abetting is generally defined as follows, and I am going to relate it to the context of this case. A person aids and abets another person in committing an offense when, by either acts or words of encouragement or support or presence, they render assistance. In any case, the State has the burden of satisfying a jury beyond a reasonable doubt from the evidence that there was either by prearrangement on the spur of the moment, a common enterprise or an adventure and that a criminal offense was contemplated. In this case, a person *Page 670 
can't be an aider and abetter unless their purpose is to aid or abet the commission of the offense charged.
 "More specifically in the context of this case, ladies and gentlemen, an aider and abetter is one who either induces or causes another person to commit Extortion in the Second Degree, or knowingly and intentionally by prearrangement or on the spur of the moment joins in a common enterprise to commit the crime of Extortion in the Second Degree.
 "However, as I told you, the defendant must be aware of the object of the enterprise, and must act with a purpose to accomplish Extortion in the Second Degree.
 "You have heard testimony in this case about what Carl Wright said to liquor wholesalers, or distributors regarding doing business in this State through Ms. Chisler. These were statements made out of the presence of Ms. Chisler, and are commonly called hearsay statements. I have allowed the testimony of those hearsay statements in this case. However, you may consider this testimony against Ms. Chisler, only if you first find, that, one, a common enterprise existed to commit Extortion in the Second Degree; secondly that the person who made these statements, that's Carl Wright and Ms. Chisler, were members of this common enterprise; and third, that the statement was made to accomplish the crime of Extortion in the Second Degree.
 "Finally in this case, there is uncontroverted testimony in this case that Carl Wright made threats to wholesalers and distributors. When I say it's uncontroverted testimony, I mean it's uncontroverted testimony. You've got to decide the credibility of Mr. Wright, whether or not it's truthful. It was just uncontroverted. I'm not passing on that, that's your duties. If you believe beyond a reasonable doubt that Mr. Wright and Ms. Chisler were engaged in a common enterprise, as I have defined that term to you, and if a conviction in this case should depend on nothing other than the testimony of Carl Wright, — that is, if there exists no other evidence in this case that proves the guilt of the defendant other than the testimony of Carl Wright, then you must find the defendant not guilty, because the law of this State is that a person cannot be found guilty on the uncorroborated testimony of an accomplice. However, if there is other evidence, this sufficiency corroborates the testimony of Mr. Wright, and all the evidence proves to you beyond a reasonable doubt that the defendant is guilty, then you must return a verdict of guilty in this case."
Although we find that much of the court's charge was in error, outlining as it did the requirements for determiningconspiracy, rather than complicity liability, see Part IV, the error was not harmful to the defendant. As we have pointed out in Part IV, conspiracy liability includes an additional element of proof not required for complicity liability: an agreement, a "meeting of the minds," or a "common enterprise" among the parties to an offense. The fact that this defendant's jury was instructed in these terms, though misleading and erroneous, could not have harmed her, since the triers of fact were told that they must find an additional element (that of preconcert, agreement, or common enterprise) in order to find her guilty. Under the circumstances, the court's error could only have worked in her favor. A.R.A.P. 45.
The judgment of the circuit court is affirmed.
APPLICATION FOR REHEARING OVERRULED; RULE 39(k) MOTION DENIED; ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
All Judges concur. *Page 671